In the Matter of **INNOVATIVE CONSTRUCTION SYSTEMS, INC.**, Debtor-Appellant.

No. 85–1142.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1985.

Decided June 17, 1986.

Rehearing Denied July 9, 1986.

Earl Munson, Jr., LaFollette, Sinykin, Anderson & Munson, Madison, Wis. for debtor-appellant.

Edwin J. Hughes, Stafford, Rosebaum, Rieser & Hansen, Madison, Wis., for appellee.

Before ESCHBACH, EASTERBROOK, and RIPPLE, Circuit Judges.

ESCHBACH, Circuit Judge.

The primary questions presented on appeal in this diversity action [1] governed by

---

1. The plaintiff filed a petition in United States Bankruptcy Court for the Western District of

Wisconsin law are whether (1) the defendants misappropriated the plaintiff's trade secrets, (2) the award of compensatory damages was excessive, and (3) the award of punitive damages was warranted by the evidence. The district court granted the defendants judgment notwithstanding the verdict, and in the alternative, a new trial on compensatory damages, and denied the award of punitive damages in its entirety. For the reasons stated below, we will reverse the judgment notwithstanding the verdict, and affirm the orders granting a new trial on compensatory damages and denying punitive damages.

## I

Innovative Construction Systems, Inc. ("Innovative") is a Wisconsin corporation with its principal place of business in that state. Defendants Bowen Supply, Inc. ("Bowen Supply") and Sunbelt Brick Company, Inc. ("Sunbelt") are Georgia corporations with their principal places of business in Americus, Georgia. Defendant Harrold Bowen is president and chairman of the board of Bowen Supply and a director of Sunbelt. Both he and defendant Phillip Strand were at all times relevant to this appeal citizens of Georgia. (Hereinafter, unless otherwise indicated, the term "Bowen Supply" also refers to Sunbelt, Harrold Bowen, and Phillip Strand.)

In 1967, John Riley, an attorney, and Dorlen Hammon, a dentist, along with several others, formed Masonry Siding, Inc., to manufacture simulated brick panels for the home-building industry. Their product proved unmarketable, and Masonry Siding ultimately declared bankruptcy. In 1973, Riley and Hammon formed Innovative. Over the next several years they spent considerable time developing a new process for simulating brick paneling. The method they eventually developed required the application of three layers, composed of slag aggregate, cement, bonding agent, and slurry, to a four-by-eight-foot backing board. The resulting product was called "Panl Brick." The commercial value of the process consisted of the formulas that set forth the precise mixture of raw materials needed for each layer. These formulas were somewhat flexible in that the proportion of aggregate to water could be modified slightly to account for changes in temperature and humidity.

Hampered by insufficient operating capital, Innovative initially limited its marketing efforts to local home-improvement centers and to some outlets for national retailers. On November 15, 1977, Innovative entered into a distribution agreement with defendant Bowen Supply. The agreement gave Bowen Supply the exclusive right to sell Panl Brick to the manufactured housing market. Bowen Supply became, and remained, the only nationwide distributor of Panl Brick, and from late 1978 through 1981, sold virtually all the Panl Brick that Innovative could manufacture.

Bowen Supply was at one time interested in acquiring Innovative. On June 18, 1979, the parties met to discuss the matter. The course of their negotiations is disputed. According to Riley's testimony, Bowen Supply offered to purchase Innovative for royalties based on annual sales over a period of three to five years, the total amount of which was estimated to be $400,000.00. Bowen Supply claims that no offer based on royalties had been made. Duncan Knapp, executive vice-president for sales and marketing at Bowen Supply from 1973 to 1980, stated, however, that Bowen Supply did in fact make an offer based on royalties, and that it was disappointed when Innovative did not accept the offer.

In late September of 1979, Innovative employed defendant Strand, who eventually became plant manager. In the course of

Wisconsin requesting relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174. It then initiated adversary proceedings in that court against the defendants, which proceedings were transferred to federal district court. The district court had jurisdiction under both 28 U.S.C. § 1332(a), owing to the diverse citizenship of the parties, and under 28 U.S.C. § 1331, based on Innovative's various federal claims. We have jurisdiction pursuant to 28 U.S.C. § 1291.

his duties, Strand was often in communication with Bowen Supply. In October of 1980, Bowen Supply told Strand that it was impressed with his abilities and would be interested in offering him a position should he leave Innovative. In mid-February of 1981, Strand went to Georgia to talk with Stewart Howell, a marketing officer for Bowen Supply at the time, and spent several hours discussing employment opportunities at Bowen Supply. Both Strand and Howell testified that they did not then discuss the possibility of Strand establishing a manufacturing facility to produce simulated brick for Bowen Supply in Georgia. Howell stated further that Bowen Supply at that time had also not entered into an agreement to employ Strand.

On the 15th or 20th of March 1981, Strand gave Innovative notice that he was leaving their employ. On March 31, Strand informed Howell that he would no longer be working for Innovative. Howell reiterated Bowen Supply's interest in setting up a manufacturing plant in Georgia under Strand's supervision or, if that proved unfeasible, of placing Strand in some other position. Strand indicated that he too was interested in organizing a facility for Bowen Supply. According to Howell's testimony, he had virtually given Strand a verbal guarantee of employment before Strand left for Georgia.

Strand's last day of employment with Innovative was April 2, 1981. He knew then that he would soon assume a position with Bowen Supply, and that, if he were to establish a manufacturing plant for Bowen Supply, Innovative would lose its only customer. Nevertheless, Strand did not tell Innovative of his plans. In fact he apparently told Innovative that he would be seeking employment in Colorado. After completing his duties that day, Strand loaded his furniture onto a waiting Bowen Supply delivery truck, and headed south to Georgia.

Shortly after arriving in Americus, Georgia on April 3, Strand began assessing the feasibility of manufacturing simulated brick paneling there. By April 8 or 9, he had located the raw materials necessary to begin operations. Strand testified that he intended to produce paneling almost identical to Panl Brick. Sunbelt was formed by Harrold Bowen, Harrold's brother Frank, and Strand in May of 1981, and it commenced production of brick paneling by June, with the first shipments made in July. Strand became vice-president of Sunbelt—his annual salary at Sunbelt was $24,000.00 as compared to the approximately $17,000.00 he received from Innovative.

At trial, Bowen Supply conceded that it used virtually the same manufacturing techniques which Innovative had developed for the production of Panl Brick. It did, however, modify the formulas Strand had acquired while employed by Innovative. These modifications were necessitated by differences in climate between Wisconsin and Georgia, as well as by the availability of slag aggregate. Innovative testified that the time Bowen Supply needed to develop workable variations to its formulas was insignificant compared to the effort it had expended developing the original formulas.

On May 12, 1981, Bowen Supply cancelled its distribution agreement with Innovative. Shortly thereafter, Innovative went out of business. On September 1, 1981, Innovative filed a petition in the United States Bankruptcy Court for the Western District of Wisconsin requesting relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174. The adversary proceedings forming the basis of this appeal were filed against Bowen Supply on March 28, 1982, and were transferred to federal district court for trial on August 26, 1983. In its complaint Innovative alleged four grounds for relief: (1) misappropriation of trade secrets under Wisconsin law; (2) restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1; (3) breach of an implied covenant of good faith under Wisconsin law; and (4) unfair competition in violation of the Lanham Trade-Mark Act, 15 U.S.C. § 1125. On February 6, 1984, the district court dismissed Innovative's Sherman Act claim, and that for breach of

an implied covenant of good faith. On August 9, 1984, the court granted summary judgment for Bowen Supply on Innovative's unfair competition claim, and granted partial summary judgment against Innovative on that portion of its trade-secrets claim relating to the manufacturing process. The only claim remaining for trial was that under Count I in which Innovative asserted that the formulas used in the production of Panl Brick were trade secrets.

The jury returned a verdict against all defendants on liability for misappropriation of Innovative's production formulas, and following a hearing on damages, awarded Innovative $225,000.00 in compensatory, and $100,000.00 in punitive damages. On December 21, 1984, the district court granted the defendants judgment notwithstanding the verdict,[2] and in the alternative, denied the award of punitive damages and ordered a new trial on compensatory damages. This appeal followed.[3]

## II

### A. Wisconsin Law of Trade Secrets

This is an action in diversity, and the parties agree that Wisconsin law governs the substantive issues presented. We see no reason to disturb that stipulation. *Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174, 178 (7th Cir. 1986); *Prudential Insurance Co. v. Sipula*, 776 F.2d 157, 161 (7th Cir.1985). The doctrine of trade secrets arose out of efforts to "deal with a particular problem in American industry—employee mobility among key employees of an industrial concern." *Abbott Laboratories v. Norse Chemical Corp.*, 33 Wis.2d 445, 453, 147

N.W.2d 529, 532 (1967). In deciding whether to protect information, a balance must be struck between the competing interest of an employer in precluding others from exploiting specialized knowledge developed during the course of an employment relationship, and that of the former employee in the general use of his skills or training. Employers seek to protect information that they have spent time and effort gathering, and that gives them an advantage over competitors. Employees, however, quite understandably do not want such information protected if doing so would restrict their ability to find another position in the field in which they have developed expertise. *Id.* at 453–54, 147 N.W.2d at 532–33. To the degree that according trade secret status to information affects the willingness of employers to undertake valuable research, or the willingness of others to hire a competitor's former employee, and hence, to make use of such information, third-party interests are implicated as well. *Id.* at 454, 147 N.W.2d at 533.

The Wisconsin Supreme Court has drawn narrowly the scope of trade-secret protection "to effectuate the public policies of encouraging business competition and facilitating worker mobility." *Wisconsin Electric Power Co. v. Public Service Commission of Wisconsin*, 110 Wis.2d 530, 537, 329 N.W.2d 178, 182 (1983); *see also Corroon & Black-Rutters & Roberts, Inc. v. Hosch*, 109 Wis.2d 290, 294–95, 325 N.W.2d 883, 888 (1982); *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis.2d 202, 214, 267 N.W.2d 242, 248 (1978). It is essential that the information in question is disclosed to the employee in confidence, *Corroon &*

---

**2.** A motion for judgment notwithstanding the verdict under Fed.R.Civ.P. 50(b) may be brought to challenge either the sufficiency of the evidence to support the verdict, *see, e.g., Yarbrough v. Tower Oldsmobile*, 789 F.2d 508, 512–14 (7th Cir.1986), or to attack the verdict on grounds unrelated to the sufficiency of the evidence, *see, e.g., Benson v. Allphin*, 786 F.2d 268 (7th Cir.1986) (defense of qualified immunity). Under Wisconsin rules of civil procedure, however, a motion for judgment notwithstanding the verdict is not a challenge to the sufficiency of the evidence; rather:

> A party against whom a verdict has been rendered may move the court for judgment notwithstanding the verdict in the event that the verdict is proper but, for reasons evident in the record which bear upon the matters not included in the verdict, the movant should have judgment.

Wis.Stat.Ann. § 805.14(5)(b) (West 1977).

**3.** Innovative has abandoned its appeal from the district court's grant of partial summary judgment on its trade-secret claim relating to the production process as opposed to the formulas.

*Black,* 109 Wis.2d at 294–95, 325 N.W.2d at 886; *RTE Corp. v. Coatings, Inc.,* 84 Wis.2d 105, 115–16, 267 N.W.2d 226, 231–32 (1978); *Abbott Laboratories,* 33 Wis.2d at 454–55, 147 N.W.2d at 533; *see also American Can Co. v. Mansukhani,* 728 F.2d 818, 819–20 (7th Cir.1982) (hereinafter *American Can Co. I* ); *Bendix Corp. v. Balax, Inc.,* 421 F.2d 809, 821 (7th Cir.). *cert. denied,* 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970), and that it is kept genuinely secret from others in the industry. *Corroon & Black,* 109 Wis.2d at 294–95, 325 N.W.2d at 886; *Abbott Laboratories,* 33 Wis.2d at 456, 147 N.W.2d at 534; *see also American Can Co. v. Mansukhani,* 742 F.2d 314, 329 (7th Cir.1984) (hereinafter *American Can Co. II* ). "So long as a departing employee takes with him no more than his experience and intellectual development ..., and no trade secrets or processes are wrongfully appropriated, the law affords no recourse." *Gary Van Zeeland,* 84 Wis.2d at 214, 267 N.W.2d at 248. Thus, the determination whether to protect information in a particular case depends upon a detailed examination of the facts and the nature of the information involved. *See, e.g., Corroon & Black,* 109 Wis.2d at 295, 325 N.W.2d at 886; *Gary Van Zeeland,* 84 Wis.2d at 206–09, 267 N.W.2d at 244–46; *RTE Corp.,* 84 Wis.2d at 116, 267 N.W.2d at 231–32; *American Welding Engineering Co. v. Luebke,* 37 Wis.2d 697, 702–03, 155 N.W.2d 576, 578 (1968); *Abbott Laboratories,* 33 Wis.2d at 457, 147 N.W.2d at 535.

In *Abbott Laboratories,* the Wisconsin Supreme Court adopted § 757 of the Restatement (First) of Torts (1939) as the "correct[ ] state[ment] of the general law of trade secrets." 33 Wis.2d at 456, 147 N.W.2d at 534; *see also Wisconsin Electric,* 110 Wis.2d at 535, 329 N.W.2d at 181; *Corroon & Black,* 109 Wis.2d at 295, 325 N.W.2d at 886; *Gary Van Zeeland,* 84 Wis.2d at 210–11, 267 N.W.2d at 247; *American Welding Co.,* 37 Wis.2d at 701–02, 155 N.W.2d at 577. The Restatement lists six factors as relevant to the determination whether given information is a trade secret:

(1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757 comment b (1939).

In *Corroon & Black,* 109 Wis.2d at 297, 325 N.W.2d at 887, the Wisconsin Supreme Court declared that "[e]ach of the six factors should indicate that a trade secret exists if the information is to be afforded legal protection." Relying on this statement, Bowen Supply claims that, under Wisconsin law, a plaintiff must establish *each* of the six factors in order to prevail on a trade secrets claim. Innovative contends that this position inaccurately characterizes the court's holding. The special verdict submitted to the jury in the instant case required an affirmative finding on each of the six factors before a finding of liability could be made.[4] The jury found that Innovative established the existence of each factor. Because we hold that the record supports the jury's answer to each, we express no opinion whether the coincidence of all these factors is a necessary, as well as sufficient, condition for a trade-secrets claim under Wisconsin law.

## B. Judgment Notwithstanding the Verdict

### 1. Standard of Review

In reviewing the jury's verdict on a motion for judgment notwithstanding the verdict under Fed.R.Civ.P. 50(b), a federal district court sitting in diversity applies the

---

**4.** See note 6 for the special verdict form.

standard of the forum state.[5] *See, e.g., Cook v. Hoppin,* 783 F.2d 684, 693 (7th Cir.1986); *F.W. Hempel & Co. v. Metal World, Inc.,* 721 F.2d 610, 613 (7th Cir. 1983); *Wieloch v. Rogers Cartage Co.,* 290 F.2d 235, 237 (7th Cir.1961). Furthermore, on appeal, as would a state appellate court, we owe deference to the jury, not the district court. *McMahon v. Eli Lilly & Co.,* 774 F.2d 830, 832 (7th Cir.1985); *see General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.,* 695 F.2d 281, 286 (7th Cir.1982). Under Wisconsin rules of civil procedure, a post-verdict evidentiary challenge must be brought under § 805.14(1), which provides:

> No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

Wis.Stat.Ann. § 805.14(1) (West 1977).

The Wisconsin Supreme Court has interpreted § 805.14(1) to require the reviewing court to determine "whether there is any credible evidence in the record on which the jury could have based its decision. The evidence is viewed in the light most favorable to sustain the verdict; we do not look for credible evidence to sustain a verdict the jury could, but did not, reach." *Sumnicht v. Toyota Motor Sales, U.S.A., Inc.,* 121 Wis.2d 338, 360, 360 N.W.2d 2, 12 (1984); *see also D.L. v. Huebner,* 110 Wis.2d 581, 634, 329 N.W.2d 890, 914 (1983). Moreover, "[t]he credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, and where more than one inference can be drawn from the evidence, this court must accept the inference drawn by the jury." *Roach v. Keane,* 73 Wis.2d 524, 536, 243 N.W.2d 508, 515 (1976); *see also Sumnicht,* 121 Wis.2d at 360, 360 N.W.2d at 12; *Johnson v. American Family Mutual Insurance Co.,* 93 Wis.2d 633, 644, 287 N.W.2d 729, 735 (1980).

## 2. The Special Verdict Form

▪ Before turning to a review of the jury's verdict, we shall address a procedural point raised by the parties. Bowen Supply contends that our review in the instant case should be less deferential to the jury than otherwise suggested by the case law cited above. This is so, it argues, because under Wisconsin law the issue whether a trade secret exists is a mixed question of law and fact. In particular, the issue, as Bowen Supply puts it, of "what actually happened is a question of fact," properly submitted to the jury, whereas the issue of "whether those facts as a matter of law fulfill a particular legal standard is a ques-

---

**5.** We have noted on several occasions that the line of cases in this circuit requiring a federal district court to apply the forum-state standard when reviewing a jury verdict under a motion for judgment notwithstanding the verdict conflicts with the rule in other circuits. *See, e.g., Dr. Franklin Perkins Schools v. Freeman,* 741 F.2d 1503, 1517 n. 20 (7th Cir.1984); *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 970 (7th Cir.1983); *Illinois State Trust Co. v. Terminal Railroad Ass'n,* 440 F.2d 497, 500 (7th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 100, 30 L.Ed.2d 96 (1971); *see generally* C. Wright, *Law of Federal Courts* 449–50 (1976). This line of cases conflicts with at least one other case in this circuit as well. *Gudgel v. Southern Shippers, Inc.,* 387 F.2d 723, 725 (7th Cir.1967) ("It is equally well settled that federal law controls on the procedural question inherent in granting a motion for judgment notwithstanding the ver-

dict.") In neither *Wieloch v. Rogers Cartage Co.,* 290 F.2d 235, 237 (7th Cir.1961) (state standard), nor *Gudgel* (federal standard) was our choice based on a determination that the underlying issue was substantive or procedural. *See Sibbach v. Wilson & Co.,* 312 U.S. 1, 16–19, 61 S.Ct. 422, 427–29, 85 L.Ed. 479 (1941). What is more, the cases decided after, but contrary to, *Gudgel* make no more mention of *Gudgel* than *Gudgel* made of contrary authority at the time it was decided.

We note that the Wisconsin formulation, at least as interpreted by the courts of that state, is virtually identical to the federal standard. Furthermore, under the facts of this case, any meaningful distinction that might exist between the two standards, and we do not mean to suggest that one does, would not affect the outcome. Therefore, it is unnecessary for us to reexamine this issue.

tion of law," and hence, falls outside the province of the jury.

It is true that, under Wisconsin law, a trade-secrets claim presents issues of both law and fact. *See, e.g., Corroon & Black*, 109 Wis.2d at 294, 325 N.W.2d at 885. In particular, the ultimate question whether certain information constitutes a trade secret is one of law for the court. *Id.; M. Bryce & Associates v. Gladstone*, 107 Wis.2d 241, 249, 319 N.W.2d 907, 911 (Wis. App.1982). Nevertheless, the special verdict form at issue was drafted by Bowen Supply and submitted at its request, and over Innovative's objection.[6] In its brief on appeal, Bowen Supply conceded that "the present case was properly presented to the jury within the framework established by *Corroon & Black*." Bowen Supply has hence waived on appeal whatever objection it might have had to submitting the special verdict interrogatories to the jury, even were these mixed questions of law and fact—a matter upon which we express no opinion. Furthermore, by failing at trial to object to the wording of the special interrogatories it waived any objections it might have had thereto. Fed.R.Civ.P. 51; *see, e.g., Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1268 (7th Cir.1986) ("[I]n a civil case each party must live with the legal theory reflected in instructions to which it does not object.") (quoting *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 675 (7th Cir.1985), *cert. denied*, —— U.S.

——, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986)); *see also Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1312 (7th Cir.1985). To the extent, then, that Bowen Supply's attempt to modify the traditional standard of review of a jury verdict constitutes an indirect attack on either the submission of the special verdict to the jury, or to the phraseology of the interrogatories, its argument is unpersuasive.

The special verdict in the instant case required the jury to answer interrogatories modeled on the six factors listed in the Restatement. A finding of liability of misappropriation of trade secrets was predicated upon an affirmative answer to each. That is, once the jury found that Innovative established each factor, the existence of a protectable trade secret followed as a matter of law. This approach is fully consistent with Wisconsin law. *See M. Bryce & Associates*, 107 Wis.2d at 251, 319 N.W.2d at 912 ("Since the evidence in this case fulfills the criteria necessary to constitute a trade secret, we conclude that, as a matter of law, a trade secret existed.").

### 3. Sufficiency of the Evidence

■ In granting Bowen Supply judgment notwithstanding the verdict, the district court found that there was insufficient evidence to support an affirmative answer to the second, third, and sixth interrogatories, *i.e.*, (1) did Innovative take reasonable precautions to limit knowledge of the for-

---

6. At the close of evidence, the district court instructed the jury and submitted the following special verdict form for the jury's consideration:

1. Were the formulas used by plaintiff in its production of Panl Brick generally unknown outside the plaintiff's business?
ANSWER: _____
(Yes or No)

2. Did the plaintiff take such precautions as were reasonably necessary to limit knowledge of its formulas among its employees?
ANSWER: _____
(Yes or No)

3. Did the plaintiff take such measures as were reasonably necessary to guard the secrecy of its formulas?
ANSWER: _____
(Yes or No)

4. Were the plaintiff's formulas valuable to it and its competitors?

ANSWER: _____
(Yes or No)

5. Did plaintiff expend significant efforts or money in developing the formulas?
ANSWER: _____
(Yes or No)

6. Would a competitor of plaintiff have had difficulty in acquiring or producing duplicate or comparable formulas without resorting to improper means?
ANSWER: _____
(Yes or No)

7. Which, if any, of the following defendants improperly used or disclosed the plaintiff's trade secrets? (Answer yes or no)

_____ Bowen Supply, Inc.
_____ Harrold P. Bowen
_____ Sunbelt Brick Systems, Inc.
_____ Phillip Strand

mulas among its employees; (2) did Innovative adopt reasonable measures to guard the secrecy of its formulas from potential competitors; and (3) would such a competitor have had difficulty in acquiring or developing duplicate or comparable formulas without resorting to improper means.[7] We shall consider each of these in turn.

(1) An indispensable element of a trade-secrets claim is that the information, for which legal protection is sought, be genuinely secret. *See, e.g., Carroon & Black,* 109 Wis.2d at 295, 325 N.W.2d at 886; *RTE Corp.,* 84 Wis.2d at 115–16, 267 N.W.2d at 231–32; *Abbott Laboratories,* 33 Wis.2d at 456, 147 N.W.2d at 534; *M. Bryce & Associates,* 107 Wis.2d at 249–50, 319 N.W.2d at 911. The law affords no protection against a person who learns the trade secret legitimately and where no duty of confidence is imposed. *RTE Corp.,* 84 Wis.2d at 115, 267 N.W.2d at 231. However, "[i]t is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy...." *Abbott Laboratories,* 33 Wis.2d at 457, 147 N.W.2d at 535 (quoting from Restatement (First) of Torts § 757 comment b (1939)). Thus, "where what is thought to be a trade secret is disclosed, the question posed is whether ... the recipient of the information knew or should have known that the information is a trade secret and that the disclosure was made in confidence." *RTE Corp.,* 84 Wis.2d at 117–18, 267 N.W.2d at 232.

Bowen Supply argues that (1) because the formula for the slurry coat was posted in the dye shed within its manufacturing plant, and (2) because some of its employees who knew the formulas did not have the need to, Innovative irrevocably compromised the confidentiality of its formulas. We disagree.

The fact that the slurry formula was posted in the dye shed does not, as a matter of law, negate Innovative's claim that the formulas were secret. Innovative introduced evidence sufficient for the jury reasonably to infer that all employees were informed of the confidential nature of the material, and pledged to keep it secret. *M. Bryce & Associates,* 107 Wis.2d at 250, 319 N.W.2d at 911. In addition, Innovative introduced testimony as to the physical layout of the manufacturing plant, including the location of the dye shed. Thus, even if one or more employees were not informed of the confidential nature of the slurry formula, it was possible for the jury to determine the probability that such an employee would have had access to this formula, and, hence, to decide whether other measures reasonably should have been adopted to limit knowledge of it among Innovative's employees. We have found no authority under Wisconsin law for the proposition that the limited access involved in the instant case necessarily precludes a claim to trade secret protection. Until the courts in Wisconsin articulate such a rule, neither shall we. *See Prudential Insurance Co.,* 776 F.2d at 162; *Twin Disc, Inc. v. Big Bud Tractor, Inc.,* 772 F.2d 1329, 1333 (7th Cir.1985).

We also find credible evidence to support a reasonable inference that only those employees involved in their use were told the formulas. The fact that almost all of Innovative's employees, at some time during their employment, mixed the various coats, and hence, knew the formulas, does not conclusively demonstrate, without more, that the formulas were not treated confidentially. In determining whether a confidential relationship existed between the parties privy to the subject matter of a claimed trade secret, one must consider the totality of the circumstances. *RTE Corp.,* 84 Wis.2d at 119, 267 N.W.2d at 233. We find it was reasonable for the jury to conclude that the size and nature of Innovative's production process warranted extensive employee knowledge of the formulas.

---

**7.** Bowen Supply does not challenge the court's conclusion that the answers to the other interrogatories were supported by the evidence.

Bowen Supply's reliance on *Corroon & Black* to the contrary is unavailing. In that case, the Wisconsin Supreme Court held that an insurance agency's customer and policy-expiration lists were not trade secrets. The court found that, because all its employees had access to the lists, the agency had taken inadequate measures to limit knowledge of the lists among its employees. *Corroon & Black*, 109 Wis.2d at 297, 325 N.W.2d at 887. There was no indication, however, that the agency had informed its employees that the lists were confidential, or that the employees were pledged to secrecy. The former employer did testify that, in his opinion, the lists were confidential. *Id.* The court quite reasonably concluded, however, that the unfettered access of its employees to the lists undermined the agency's otherwise uncorroborated statement that it considered the lists a trade secret. Furthermore, the agency did not claim that the large number of employees who knew of the lists were involved in their use.

Thus we find there was sufficient credible evidence from which the jury could infer that Innovative took reasonable precautions to limit knowledge of the formulas among its employees, and that those formulas were disclosed to Strand in confidence under a pledge of secrecy.

(2) The district court concluded that the jury's finding that Innovative adopted reasonably adequate measures to protect the secrecy of its formulas was unsupported by the evidence. In analyzing this issue, we shall consider whether there is sufficient evidence of (a) Innovative's efforts to impress upon its employees the need to keep the formulas secret, (b) the measures it adopted to restrict access of non-employees to the formulas, and (c) the steps it took to guard the secrecy of its formulas when discussing the possible sale of its business to others.

Innovative did not require its employees to sign nondisclosure agreements. Employee guidelines posted within the production area did not mention the confidential nature of the formulas. Furthermore, employees were not given exit interviews concerning the confidential nature of the formulas. Bowen Supply contends that this establishes "as a matter of law that [Innovative] did not take the steps necessary to impress upon its employees the need to keep its formulas secret." We disagree.

■ We find no support in Wisconsin case law for the proposition that the failure to hold exit interviews or to require written non-disclosure agreements necessarily entails that an employer failed to take reasonably adequate steps to impress upon its employees the secret nature of the information at issue. It is, of course, true that one claiming trade-secret protection must have taken steps to safeguard the secrecy of the information in question. *See, e.g., RTE Corp.*, 84 Wis.2d at 119, 267 N.W.2d at 233 ("Where the owner of the secret disregards caution and fails to take steps to safeguard against disclosure, the courts will, at times, deny him any relief whatever, principally on the theory that he courted his own disaster."); *Bendix Corp. v. Balax, Inc.*, 421 F.2d at 821 ("[P]laintiff took no adequate precautions to protect its trade secrets from the defendants whom it should have regarded as potential competitors."). But again, the relevant question is whether, under the circumstances, the measures adopted were reasonable. *RTE Corp.*, 84 Wis.2d at 115, 267 N.W.2d at 231.

For us to require written non-disclosure statements or exit interviews as a matter of law would overlook the nature of the special verdict interrogatory. In asking whether particular efforts were reasonably adequate under the circumstances, the jury is called upon in part to exercise their common-sense judgment in determining whether additional measures were necessary to guard the secrecy of the formulas. In essence, this requires an assessment of the size and nature of Innovative's business, the cost to it of additional measures, and the degree to which such measures would decrease the risk of disclosure. What may be reasonable measures in one context may not necessarily be so in another. Under the facts of this case, it is sufficient that

the employees were apprised of the secret nature of the formulas, and were told, and agreed, to keep that information confidential.

Innovative also did not employ security personnel, and the plant was not locked during working hours. Suppliers, job applicants, and personal friends of employees were not denied entry into the manufacturing area. Bowen Supply argues that this establishes as a matter of law that Innovative failed to take reasonably adequate steps to guard the secrecy of its formulas. We disagree.

Innovative introduced testimony that, because of the wet cement generated in production of Panl Brick, nonemployees would not enter the manufacturing area to an extent sufficient to closely observe the process. We must be mindful also that on appeal Innovative is not claiming trade secret status for the entire production process, but for the formulas only. These formulas, aside from that for the slurry coat, were kept in a notebook in the plant manager's office, and hence out of view. There is no indication in the record that the amount of time such nonemployees were allowed in the plant was substantial, and there is certainly no reason to think that they were in a position to glean the information contained in the formulas from the casual observation of the manufacturing process.

As to the slurry formula, which was posted in the dye shed, the jury was shown a diagram of the plant area, and one of Innovative's witnesses marked on the diagram the area that visitors entered. Hence, the jury was given sufficient evidence from which it could determine the probability whether someone other than an employee could have seen the slurry formula, and whether additional security measures were necessary under the circumstances. We find that there is sufficient evidence to support the inference that the measures adopted by Innovative to guard

the secrecy of its formulas from non-employees were reasonably adequate.

Finally, Bowen Supply argues that Innovative took inadequate steps to guard the secrecy of its formulas when discussing the possible sale of its business to others. Several companies, including Bowen Supply, had expressed an interest in acquiring Innovative. Representatives from some of these companies would inspect the manufacturing plant. Innovative did not require either the companies or their representatives to sign non-disclosure agreements.

Innovative introduced evidence, however, that written non-disclosure agreements were not normally used in the industry, at least during the preliminary stages of acquisition relevant here. Innovative also introduced testimony that it either obtained oral pledges of confidentiality from interested parties or did not divulge confidential information to them.[8] In regard to representatives of Bowen Supply who occasionally visited the production facility, Innovative introduced testimony that it would hide some of the raw materials used in the process and bring out others in their stead to prevent these representatives from learning the formulas. One such representative testified that, although he was allowed to observe the production line, he was unable to determine how the final product was made. Another representative of Bowen Supply stated that the plant was not in operation at the time he visited it. Yet another Bowen Supply official testified that he learned very little about the production process during his visits, and did not indicate that he had either learned or had access to the formulas.

A representative of another company expressing an interest in acquiring Innovative prepared a report that contained a general description of Panl Brick, including a list of the gross proportions of raw materials used to produce it. Innovative subsequently sent a copy of this report to Bowen Supply. Innovative offered testimony that

---

**8.** Apparently some of the other businesses who had expressed a tentative interest in acquiring Innovative never visited the production plant, and Innovative testified that confidential information was not disclosed to them.

the representative who compiled the report was pledged to secrecy. The report did not disclose the exact proportions of raw materials used to produce Panl Brick, nor did it indicate the proportions of these materials relative to the three layers in which they were applied. After a thorough examination of this document and of the Panl Brick formulas, we hold that a reasonable jury could find that Innovative did not compromise the secrecy of those formulas by sending the report to Bowen Supply.[9] Furthermore, we find that the evidence as a whole, together with all reasonable inferences drawn therefrom, supports the jury's finding that Innovative took reasonably adequate steps to ensure the secrecy of its formulas.

(3) The district court found that the formulas for Panl Brick "were clearly unsophisticated," and "represent[ed] no great advance in technology." Apparently assuming that Wisconsin law requires "[a] palpable advance of the prior art," the court concluded that there was insufficient evidence to support the jury's findings that Innovative's competitors would not be able to duplicate the formulas without resorting to improper means.

■ Uniqueness in the patent-law sense is not an essential element of a trade secret. *Forest Laboratories, Inc. v. Pillsbury Co.*, 452 F.2d 621, 624 (7th Cir.1971) (applying Wisconsin law). Nonetheless, a trade secret must possess at least that modicum of originality that will separate it from everyday knowledge. *Id.* However, "[t]he idea need not be complicated; it may be intrinsically simple and nevertheless qualify as a secret, unless it is common knowledge and, therefore, within the public domain." *Id.; see also Abbott Laboratories*, 33 Wis.2d at 467, 147 N.W.2d at 538 ("alleged trade secrets were published and were commonly known in the trade and readily discernible in the chemical engineering field").

In answering the first special verdict interrogatory, the jury found that the formulas used by Innovative in the production of Panl Brick were generally unknown outside of its business. The district court found that there was sufficient evidence to support this finding, and Bowen Supply, on appeal, has not challenged the jury's finding. Furthermore, Innovative introduced evidence that Panl Brick was a unique product in the industry. Bowen Supply's contention, even if true, that "anyone knowledgeable in the field would have [no] difficulty in developing mixtures comparable to those of" Innovative's is beside the point. As we noted in *American Can Co. I*, "[a] few sophisticated competitors may have had the resources to analyze and reproduce the [product] by fair means. [The defendant], however, obtained the formulae pursuant to a confidential relationship. The fact that someone else might have discovered the secret by fair means does not protect him." 728 F.2d at 819–20 (applying Wisconsin law).

Bowen Supply argues that affording trade-secret protection to Innovative's formulas, irrespective of what it characterizes as their unremarkable nature, conflicts with the policy concern that a departing employee should be able to take with him the "experience and intellectual development that has ensued while being trained by another." *See, e.g., Gary Van Zeeland*, 84 Wis.2d at 214, 267 N.W.2d at 248. This point is not well taken. In adopting the Restatement, the Wisconsin Supreme Court understood it to strike a proper balance between the competing policy considerations, including that of employee mobility. *See, e.g., Abbott Laboratories*, 33 Wis.2d at 456, 147 N.W.2d at 534. It is not the function of a federal court sitting in diversity to restrike that balance.

■ Finally, Bowen Supply contends that, because Strand modified Innovative's formulas before using them at Sun Belt, it

---

**9.** We note also that John Riley, president of Innovative, testified that his notes of a conference between Bowen Supply and Innovative reveal that no further negotiations would be conducted between the two parties regarding a possible acquisition until a non-disclosure agreement was entered into.

should not be held liable for their use. Bowen Supply's contention misapprehends the purpose of affording trade-secret protection. The "modifications" in question here were necessitated by differences in the climate of Wisconsin and Georgia, and by the availability of certain raw materials. As we stated in *Forest Laboratories*, 452 F.2d at 625, "the user of another's trade secret is liable even if 'he uses it with modifications or improvements upon it effected by his own efforts,' so long as the substance of the process used by the actor is derived from the other's secret." *See also M. Bryce & Associates*, 107 Wis.2d at 252, 319 N.W.2d at 912; Restatement (First) of Torts § 757 comment c (1939). Were the law of trade secrets not flexible enough to reach the modifications in the instant case, when it is evident that the formulas were substantially derived from Innovative's, it would indeed be hollow. *American Can Co. II*, 742 F.2d 314, 329 (1984) (applying Wisconsin law).

In conclusion, we hold that there was sufficient evidence to support the jury's finding that a competitor would have had difficulty replicating the formulas without resorting to improper means.

## C. Damages

### 1. Compensatory Damages

Following a hearing on damages, the jury awarded Innovative $225,000.00 in compensatory damages. The district court held the award excessive as a matter of law, and granted Bowen Supply's alternative motion for a new trial on damages. A district court sitting in diversity applies the federal standard for reviewing the size of a jury award.[10] *Galard v. Johnson*, 504 F.2d 1198, 1200 (7th Cir.1974); *see also* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2802 (1973). Only if the award is "monstrously excessive," *see, e.g., Joan W. v. City of Chicago*, 771 F.2d 1020, 1023 (7th Cir.1985); *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir.1983), a product of passion and prejudice, *see, e.g., Benson v. Allphin*, 786 F.2d 268, 280 (7th Cir.1986); *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1141 (7th Cir.1985), or if there is no rational connection between it and the evidence, *see, e.g., Joan W.*, 771 F.2d at 1023; *Abernathy*, 704 F.2d at 971, may the court disturb it.[11] Underlying this deference to a jury's

10. In *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 970–71 (7th Cir.1983) (Posner, J.), we noted a tension between the holding in *Galard v. Johnson*, 504 F.2d 1198, 1200 n. 1 (7th Cir.1974), requiring a district court sitting in diversity to adopt the federal standard for reviewing a jury's damage award, and the rule in this circuit that the state test for judgment notwithstanding the verdict applies in diversity as well. Both situations require an examination of the evidence in support of the jury's findings. The prevailing view on this matter is that the choice between state and federal law should be the same in both contexts. *See* C. Wright & A. Miller, Federal Practice and Procedure § 2525 (1971); *Abernathy*, 704 F.2d at 971.

Nevertheless, this tension may be more apparent than real. As we observed in *Abernathy*, 704 F.2d at 971:

[A] rule determining how much evidence of liability a plaintiff must put in to defeat the defendant's motion for a directed verdict [or judgment notwithstanding the verdict] can be viewed as part of the definition of the plaintiff's substantive rights under state law rather than as a rule merely of jury control; it goes to liability not just to the amount of damages, and it determines the defendant's right to judgment and not just to a new trial.

In any event, if there is a tension, the functional equivalence between the Wisconsin and federal standards applicable in the instant case eliminates the need for a reexamination of the rule in this circuit.

11. Although not relevant to the disposition of the instant appeal, we note that "this court [recently] added an additional element to the equation where the case under review is but one of a series of similar cases that establish a trend in damage awards," *viz.*, comparability. *Joan W. v. City of Chicago*, 771 F.2d 1020, 1023 (7th Cir.1985); *see also Levka v. City of Chicago*, 748 F.2d 421, 425 (7th Cir.1984) ("One factor we must consider in determining whether to set aside an award is whether the award is out of line compared to other awards in similar cases.") The desideratum of "similar results in similar cases" can better be attained by allocating decision-making in this regard to appellate courts rather than trial courts. The trial court's superior position in regard to a particular jury award does not help achieve roughly uniform damages awards in cases involving very similar facts. Therefore, traditional notions of deference do not carry as much weight and an appellate court may properly exercise more control over the size of damage awards in such cases.

assessment of damages is the acknowledgement that "the actual measure of damages is an exercise in fact-finding," *Whitley v. Seibel,* 676 F.2d 245, 252 (7th Cir.), *cert. denied,* 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982); *see also Knapp v. Whitaker,* 757 F.2d 827, 846 (7th Cir.1985), and any rule on the scope of the judge's control of the jury has Seventh Amendment implications. *See Abernathy,* 704 F.2d at 971 (citing *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d 1061, 1065–66 (4th Cir.1969)).

Had the district court denied Bowen Supply's motion for a new trial on damages, we would review its decision for an abuse of discretion. *See, e.g., Joan W.,* 771 F.2d at 1023 ("[A]ppellate review is governed by the extremely limited abuse of discretion standard."); *Abernathy,* 704 F.2d at 971; *Galard,* 504 F.2d at 1199. This is a recognition of the trial judge's superior ability, *vis à vis* an appellate court, by virtue of having heard the evidence, and observed the jury first hand, to assess the fairness and competence of the jury's award.[12] *Abernathy,* 704 F.2d at 971; *see also United States v. Bruscino,* 687 F.2d 938, 940–41 (7th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983). It is only appropriate that we demand a particularly persuasive showing of excessiveness when the initial fact-finder—the jury—and the judge—who monitored the proceedings—agree that the award is appropriate.

In the instant case, however, we are called upon to review the district court's order granting, not denying, a new trial on damages. In such a case, the jury and the trial judge differ in their respective assessments of an appropriate damage award. Thus, the two considerations supporting the extremely deferential standard for reviewing the denial of a new trial are at odds. *See, e.g., Taylor v. Washington Ter-*

*minal Co.,* 409 F.2d 145, 148 (D.C.Cir. 1969). Hence, a somewhat more exacting standard of appellate review should apply. Otherwise proper recognition would not be given to the Seventh Amendment limitations on the judge's power to reexamine the jury's verdict. *See id.;* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2820 (1973). Nevertheless, because of his superior position to assess the credibility of witnesses and the like, the trial judge's determination warrants substantial deference. *Cf. Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Thus, if it is clear that the size of the jury's award falls within the maximum limit of a reasonable range of damages, it must stand, and we will reverse the trial judge's grant of a new trial. *See Taylor,* 409 F.2d at 148.

After a thorough examination of the record, we conclude that the award of $225,000.00 does not fall within a reasonable range of damages. The district judge found the award based for the most part upon the testimony of Innovative's expert witness, John Bodilly, who valued its business at $246,000.00. The district judge stated, "[h]indsight clearly shows [Bodilly's] conclusion to be virtually without foundation." We wholly concur.

For the most part, Bodilly's calculations were based upon an unaudited financial statement of Innovative for a six-month period ending December 31, 1980. He projected sales of $400,000.00 per year over a ten-year period, despite the fact that Sunbelt's actual annual sales were never over $175,000.00 for any of the years preceding trial during which time it produced paneling virtually identical to Panl Brick. Furthermore, even though sales of Panl Brick for the year immediately preceding Bodilly's base period exceeded $400,000.00, Inno-

---

**12.** In *United States v. Bruscino,* 687 F.2d 938, 940–41 (7th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983), we observed that:

> [The trial judge] has had the opportunity to observe the jurors' demeanor and gauge their attentiveness, as the appellate judges have not.

> He can also judge, as we cannot, ... the atmosphere of the trial—that congeries of intangibles that no stenographic transcript can convey.... As we cannot put ourselves in the district judge's shoes in these matters we ought to accept his judgment, unless we have a very strong conviction of error.

vative suffered a net loss of income. In addition, Innovative was undercapitalized and strapped to meet its current liabilities. To have found Bodilly's testimony credible, the jury must have assumed that, following approximately six years of negative or negligible net income, and burdened by liabilities far in excess of its assets, Innovative was able to dramatically increase its earnings during the six-month base period. The evidence fails to support such an assumption. Indeed, it decidedly speaks against it. It is perhaps true that the parties at one point thought the formulas a Horn of Amalthea; it is, however, undeniable that they were wrong.

Innovative was entirely dependent upon its distribution contract with Bowen Supply for any sales of Panl Brick. Bowen Supply could have terminated the contract at any time upon sixty-days notice. It is undisputed that Bowen Supply was dissatisfied with the quality of Panl Brick in the period immediately preceding Strand's departure from Innovative. Bowen Supply had even lost a major account for Panl Brick due to defects in the product. Although it is true that the formation of Sunbelt, which was part and parcel of the misappropriation of Innovative's formulas, ultimately caused the termination of the distribution contract, there was absolutely no reason to suppose that the relationship between Innovative and Bowen Supply would have continued with the emergence of competitors offering a superior product. In fact, Innovative did not dispute testimony that Bowen Supply had far more sales of another paneling product. This is so despite Bowen Supply's obvious interest in selling as much of Sunbelt's product as possible, rather than that of a competitor. Hence, we conclude that the jury's award does not fall within a reasonable range of damages, and hold that the district court did not abuse its discretion in granting the motion for a new trial.

2. Punitive Damages

■ The jury awarded Innovative $100,-000.00 in punitive damages. The district court granted Bowen Supply's alternative motion to strike the award entirely. As we noted above, a breach of faith underlies every trade-secret claim. However, establishing that breach alone is insufficient to warrant an award of punitive damages; one must also demonstrate that the defendant acted wantonly, wilfully, or in reckless disregard of the plaintiff's rights. *See, e.g., Jeffers v. Nysse,* 98 Wis.2d 543, 551, 297 N.W.2d 495, 498–99 (1980). The evidence of record is palpably inadequate to support such an inference. We, therefore, affirm the district court's order striking the award of punitive damages.

### III

For the reasons stated above, we (1) RE-VERSE the judgment notwithstanding the verdict, (2) AFFIRM the order striking punitive damages, and (3) REMAND for a new trial on compensatory damages.